UNITED STATES *v.* GULF OIL CORPORATION, ET AL. (No. 4991)[1]

United States Court of Customs and Patent Appeals, December 7, 1959

[1] C.A.D. 725.

*George Cochran Doub*, Assistant Attorney General, *Richard E. FitzGibbon*, Chief, Customs Section (*Richard H. Welch*, trial attorney, of counsel), for the United States.

*Sharretts, Paley & Carter* (*Joseph F. Donohue* of counsel), for appellee.

[Oral argument October 8, 1959, by Mr. Welch and Mr. Donohue]

Before WORLEY, Chief Judge, and RICH, MARTIN and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK [2]

RICH, Judge, delivered the opinion of the court:

This appeal is from the judgment of the United States Customs Court, Second Division, C.D. 2045, sustaining the importer's protest. ▮ The imported merchandise is steel oil well casing and tubing complying with the American Petroleum Institute's specifications for API grade "J–55." The casing was classified as structural shapes under paragraph 312 and the tubing as tubes, n.s.p.f., under paragraph 328 of the Tariff Act of 1930. These classifications are not disputed.

In addition to the duty assessed under paragraphs 312 and 328, the Collector imposed an additional duty of 4% ad valorem pursuant to paragraph 305, of said Act, as modified by GATT, 82 Treas. Dec. 305, T.D. 51802. The sole issue before us is the liability for this additional duty. This liability, if there be one, arises by virtue of the manganese content of the steel of which the imported casing and tubing were made. There is no dispute as to the presence of manganese in the imported steel articles or as to its amount. The imported casing and tubing admittedly contains between 0.7% and 1.4% manganese. As will appear, the figure 1% is recited in the statute involved and since there was no attempt to segregate the importations according to manganese content, they must all be treated as though they contained more than 1%. There was no shipment wherein all the steel had a manganese content less than 1%. As to this there is no dispute.

Paragraph 305, which is in Schedule 3, "Metals and Manufactures of," as enacted and insofar as pertinent, reads:

Par. 305. In addition to the rates of duty provided for in paragraphs 303, 304, 307, 308, *312*, 313, 315, 316, 317, 318, 319, 322, 323, 324, 327, and *328* of this schedule, there shall be levied, collected, and paid on all steel or iron in the materials and articles enumerated or described in such paragraphs:

(1) A duty of 8 per centum ad valorem *if such steel* or iron *contains* more than one-tenth of 1 per centum of vanadium, or more than two-tenths of 1 per centum of tungsten, molybdenum, or chromium, or *more than six-tenths of 1 per centum of* nickel, cobalt, or *any other metallic element used in alloying steel* or iron: *Provided*, That phosphorus *shall not be considered as alloying material* unless present in the steel or iron in excess of 5 per centum, *nor shall manganese* or silicon *be so considered unless* either

---

[2] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge O'Connell*, pursuant to the provisions of Title 28, United States Code, Section 294 (d).

is *present in the steel in excess of 1 per centum*, or unless either is present in the iron in excess of 3 per centum; * * *. [Emphasis ours except *"Provided."*]

Pursuant to Presidential Proclamation effective January 1, 1948, the 8% duty was reduced to 4%.

We are here concerned with steel. The steel must be treated, for lack of segregation as stated above, as containing more than 1% manganese, though much of it did not. It is not disputed that manganese is a metallic element or that manganese is sometimes used in alloying steel, though it is not admitted that it was used in alloying the imported steel. The issue is clearly drawn, the Government taking the position that under paragraph 305 all steel containing more than 1% of manganese is subject to payment of the additional duty, regardless of the reason for its presence, and the importer urging that it is not payable except on steel wherein manganese has been used as an alloying ingredient, to produce what is known in the trade as "alloy steel."

This issue centers our attention on an ambiguity, not too apparent at first glance, in the phrase of paragraph 305: "other metallic element used in alloying steel." Does it mean every metallic element *ever* so used, or does it mean used in "alloying" the imported steel, and what, in turn, is meant by "alloying"? In this connection, what is the significance of the ensuing phrase "shall not be *considered as alloying material* unless * * * present in the steel in excess of 1 per centum"? Is this a requirement that if it is present in excess of 1% it *must* be considered to be alloying material? Or is it simply a directive that raises a conclusive presumption that 1% or less shall not be considered an alloying material while the presence of more than 1% requires a further determination on the evidence that it was used in alloying the imported steel, before the additional duty can be imposed?

Clearly the provision of the statute that manganese shall *not* be considered "as alloying material" unless present "in excess of 1 per centum" does not necessarily require a holding that it *is* alloying material when present in excess of 1%. It would have been a simple matter for the legislative drafters to have said that all steel containing more than 5% phosphorous or more than 1% manganese or silicon should be subject to the extra duty. Congress used this affirmative form of statement in paragraph 305 with respect to vanadium, tungsten, molybdenum, chromium, nickel, and cobalt. It has done so, too, with respect to "any other metallic element used in alloying steel or iron" where present in excess of 0.6%, *unless* the element be phosphorous, manganese or silicon. As to these three elements the negative

form of expression of the proviso has been employed. Another thing which is quite apparent from study of the wording of this paragraph is that phosphorous, silicon and manganese are, when present in steel, sometimes "alloying material" and sometimes not, otherwise the proviso would have no purpose. This means that, at least in one sense, manganese is a metallic element used in alloying steel. ▮ These and other considerations create an uncertainty which requires that we delve further into the matter in order to be reasonably sure of construing paragraph 305 so as to carry out the intent of Congress, in accordance with the master rule of statutory interpretation. *Sears, Roebuck & Co.* v. *United States*, 26 CCPA 161; C.A.D. 11. To ascertain such intent, the entire context of the statute must be considered and every effort made to give effect to all of its language. *Dart Export Corp., et al.* v. *United States*, 43 CCPA 64, 74; C.A.D. 610.

## THE BACKGROUND AND EVOLUTION OF PARAGRAPH 305

Paragraph 305 had its origin in the Tariff Act of 1922, paragraph 305 of which was similar except that the figure with respect to "nickel, cobalt, vanadium, chromium, tungsten, molybdenum, or any other metallic element used in alloying steel" was a uniform "six-tenths of 1 per centum." The proviso, insofar as pertinent, read: *"Provided, That manganese and silicon shall not be considered as alloying material unless present in the steel in excess of 1 per centum manganese or silicon."* It will be noted that the 1922 proviso did not mention phosphorous and that in the 1930 Act there was a lowering of the per centum figures with respect to vanadium (reduced to 0.1%) and tungsten, molybdenum and chromium (reduced to 0.2%).

The Tariff Act of 1913 contained the first mention of alloy steels (Tariff Information Surveys, 1921, Survey C–7, p. 88), the following appearing in paragraph 110 thereof:

* * * all steels by whatever process made, containing alloys [sic], such as nickel, cobalt, vanadium, chromium, tungsten, wolfram, molybdenum, titanium, iridium, uranium, tantalum, boron, and similar alloys, 15 per cent ad valorem.[3]

Preparatory to the revision of the 1913 tariff, the United States Tariff Commission prepared and transmitted to the Committee on Ways and Means a series of Information Surveys, published in 1921, Survey C–7 dealing with the steel products of paragraph 110, supra, and containing a number of statements pertinent to the problem before

[3] Use of the term "alloy" to refer to metallic elements used as alloying materials in the making of alloy steel appears frequently in earlier statutes, cases, and texts and such use, which appears to be technically inaccurate, is probably to be attributed to the fact that such alloying materials are usually introduced into the molten steel in the form of alloys such as ferromolybdenum, ferrotungsten, ferrochrome, and ferrotitanium, which are true alloys. By extension, possibly even by custom in the steel industry, the term "alloy" appears to have been applied to the elements themselves, when used in alloy steel, though no element can be an alloy, which must contain two or more elements.

us. Survey C–1 on the articles in paragraph 102 of the 1913 act, entitled "The Ferroalloy Industries," also contains relevant material. The latter, in its opening paragraphs, p. 9, says:

The ferroalloys are special products consisting of iron and some other chemical element (usually a metal) whose use in the manufacture of steel serves to give the latter more desirable qualities.

\*       \*       \*       \*       \*       \*       \*

The ferroalloys perform one or both of two functions—they are purifying or deoxidizing agencies in steel manufacture, and they add to steel elements which give it certain necessary or desirable qualities.

The chapter on "Iron Manganese Alloys" says, p. 43:

The iron-manganese alloys are the most important of the ferroalloys. They consist of spiegeleisen and ferromanganese, the principal ingredients of which, as the names indicate, are iron and manganese. When an iron-manganese alloy contains less than a given percentage of manganese it is called spiegeleisen, and when it contains this percentage or more it is denominated ferromanganese. The dividing line between spiegeleisen and ferromanganese has been changed from time to time.

At page 44:

*Uses.* Both ferromanganese and spiegeleisen are used in the manufacture of steel and perform similar functions. They are both deoxidizing and alloying agents. They were the first alloys to be used on a large scale for deoxidizing molten steel, and today are not infrequently the only ones so used. The amount of ferromanganese necessary to perform this service and add a *small* amount of manganese to the steel (*about one-half of 1 percent*) is around 17 pounds to 1 long ton of steel. \* \* \* Spiegeleisen in order to do the same amount of work must be added in much larger quantities.

The addition of manganese to the steel is an important function performed by these alloys. Under present metallurgical methods it is impossible to produce a *high grade of steel* without adding *on the average 0.4 to 0.6 percent of manganese.* In some special steels, the *manganese steels,* as much as *12 or 13 or even 15 percent of manganese* is added, usually by high-grade ferromanganese. The manganese in proper proportion gives strength and durability to the metal, and these qualities are at their maximum when the steel contains about 12 or 13 per cent manganese [4] and 1.5 to 2 per cent carbon. Manganese steel is costly and hence is employed only for special purposes, such as the jaws and wearing parts of rock-crushing machinery, railroad frogs and crossings, railroad rails on curves, mine-car wheels, and burglar-proof safes. [Emphasis ours.]

The footnote in the above quotation reads:

4. Bureau of Mines: Bulletin No. 77, pp. 144 and 145. When steel contains *more than 1 per cent* and less than 7 percent manganese it is hard and rather brittle. *New qualities appear when the manganese content reaches 7 per cent.* Toughness, as well as hardness, begins to appear, and these qualities reach their maximum when the steel contains 12 to 15 per cent manganese. [Emphasis ours.]

We now turn our attention to the 1921 Survey, "C–7," the chapter on "Alloy Steels" commencing at page 82, quoting therefrom passages which seem to us pertinent.

Page 82:

Alloy steels are special steels. The qualities of ordinary steels are due principally to their carbon content; the peculiar properties of alloy steels are attributable to the alloying metals or elements.

\* \* \* \* \* \*

The principal alloying metals or elements are nickel, chromium, molybdenum. vanadium, *manganese (8 to 15 per cent)*, and tungsten. \* \* \* *Manganese is present in all steels; but in ordinary carbon steel it constitutes only about 0.4 to 0.6 per cent* of the weight. [Emphasis ours.]

Page 83:

All steels contain small amounts of manganese, silicon, phosphorous, and sulphur, which are injurious if excessive in amount. *Manganese is a constituent of all steels, but in ordinary carbon steels constitutes about four-tenths to sixtenths of 1 per cent. Manganese in excess of 1 per cent and less than 7 per cent renders the steel hard and brittle.* [Emphasis ours.]

Page 85:

*Manganese steel.*—Simple *carbon steels contain manganese up to about 1 percent,* generally, *from 0.4 to 0.6 per cent.* These steels, however, are not classed as manganese steels. *After a content of 1 per cent is used new qualities appear in the steel.* With an increase of manganese to 6 or 7 per cent, the hardness and brittleness of the steel increases so rapidly that the material is *not of commercial value.* As the manganese content rises above 6 or 7 per cent the steel becomes tough again, reaching its maximum strength with a manganese content of 12 or 13 per cent. Above 16 or 17 per cent the steel becomes brittle again. \* \* \* [Emphasis except heading ours.]

Page 89, under the heading "Tariff Considerations":

In view of the growing importance of *alloy steels*, it might be well to provide for them in a paragraph or paragraphs by themselves, rather than in a paragraph with a number of other products. [Emphasis ours.]

All of the foregoing was preliminary to the enactment of the Tariff Act of 1922 wherein the last recommendation above quoted was followed by the incorporation of paragraph 305, a new provision. Senate Report No. 595, 67th Cong. 2d Sess., April 1922, to accompany H.R. 7456, had this to say about it (p. 12):

The cumulative duty on *alloy steels* provided in paragraph 305 is mainly designed to compensate for the increased costs resulting from the duties imposed on the alloying metals, and it also serves to provide additional protection on fine steels in the manufacture of which a large amount of labor is required. [Emphasis ours.]

The 1921 Summary of Tariff Information, which refers to Survey C–7, and also discussing paragraph 305 of H.R. 7456, said, inter alia,

### Alloy Steels

*Description and uses.*—Certain elements or metals are capable of purifying steel, and when alloyed therewith, of giving it certain desirable qualities. These metals are generally rare but add materially to the value of the steel.

It then goes on to discuss the various types of alloy steels without saying anything which would help us to solve the problem before us.

38

There were extensive hearings in the Senate, before the Committee on Finance, on the proposed tariff act which was H.R. 7456 in the 67th Cong., 2d Sess. We have read extensively therein without the guidance of either party to this litigation in search of a clue to the real intent of Congress in adopting the proviso "That manganese and silicon shall not be considered as alloying material unless present in the steel in excess of 1 per centum manganese or silicon." (Par. 305, 1922 Act.) Preliminarily we may say that Congress certainly was not untutored in the difference between carbon steels and alloy steels or the position of manganese or manganese alloys such as ferromanganese or spiegeleisen in the steel industry or the worldwide manganese supply situation. Apart from the hearings, hundreds of pages of which are devoted to the metal schedule, we have set forth above some of the material which was available to Congress which speaks for itself. The most significant thing we have been able to find in the hearings is the proposal set forth in the following excerpts from the brief filed by John H. Brewster, who addressed himself to paragraphs 304 and 305, from pages 1763 and 1764 (Vol. III), (July 21, 1921):

21. With reference to paragraph 305, our request for modification is that chrome be removed from its classification with tungsten and molybdenum and *placed with manganese and silicon,* because the effect of a small percentage of chrome in carbon steel is to intensify the hardening quality of the carbon and under modern heat-treatment practice occupies *a place in steel making similar to manganese and silicon* rather than the other alloys mentioned in this paragraph.

\*      \*      \*      \*      \*      \*      \*

23. Also, spring steels made of *silicon and manganese in percentages running from 1 to 1½ percent* are largely made in American open-hearth furnaces and sold at a few cents per pound, but there is a demand from American spring manufacturers for a small tonnage of the better quality Swedish spring steel of similar analysis, although such manufacturers will not pay 15 per cent in addition to the rates in paragraph 304 *on account of the addition of two or three tenths of 1 per cent of manganese or silicon to the 1 per cent now permitted.*

24. Therefore, it is requested that paragraph 305 be changed by eliminating the word "chromium" from the sixth line of this paragraph and inserting "chromium" in the ninth line to read: *"Provided,* That chromium, manganese, and silicon shall not be considered as alloying material unless present in the steel *in excess of 1½ per cent."* [Emphasis ours except *"Provided."*]

We find it impossible to escape the deduction from the foregoing that Congress was well aware of a construction of the paragraph 305 proviso requiring the payment of the additional 15% duty on all steel containing more than 1% manganese, that it entertained a clear request to raise that amount to 1½% for the very purpose of removing the duty from such things as spring steel containing from 1 to 1½% manganese and silicon, and that its intent was to refuse that request. In passing the 1922 Act it adhered to the 1% limit.

What now of the Tariff Act of 1930? Again there were extensive hearings and other preparations such as the 1929 Summary of Tariff Information, which deals with paragraph 305 at pages 636–640, in much the same way as did the 1921 Summary. However, here we find in addition to the discussion of other alloy steels, mention of "silicon steel employed in the manufacture of springs" and a listing in a table of chemical analyses of alloy steel bars of "Silico manganese," footnoted as "spring steel," containing as its only alloying ingredients 0.5 Carbon, 0.75 Manganese and 2.00 Silicon.

We have already dealt with some of the changes which the 1930 Act made in the paragraph, the points of most significance being, to our minds, that while it lowered the percentage limits on four of the alloying metals enumerated and added specific reference to phosphorous in the first proviso with a specific exemption up to 5%, it made no change whatever with respect to manganese and silicon, leaving them at 1%. Here too we have delved deeply into the hearings and have found, surprisingly, that in the midst of strong forces at work to change the provisions of paragraph 305 in many ways, some of which succeeded, nothing specific appears to have been said about the 1% of manganese or silicon clause. In the Tariff Readjustment Hearings—1929, before the House Ways and Means Committee, 70th Cong., 2d Sess., Vol. III, at page 1764, we find the request to lower the percentage on vanadium, chromium, tungsten and molybdenum and the proposal to add the 3% in iron provision as to manganese and silicon; at page 1901 is a proposal to raise the 8% duty to 20% and lower the 0.6% alloy provision to 0.25%; at page 1914 a proposal to lower the 8% duty to 2% while maintaining the 0.6% quantity limitation; and at page 1917 there is a proposal to raise the 0.6% minimum to 1.5%. Not one of the advocates of these amendments suggested a change in the proviso clause with which we are here concerned although the last mentioned proposal would, of course, have been inconsistent with the 1% provision in the proviso.

In the 71st Cong., 1st Sess., June 26, 1929, there were more hearings before the Senate Committee on Finance, on H.R. 2667. In Vol. III, p. 59, the American importers of fine steels vociferously attacked paragraph 305 as unjustifiable altogether. As germane to the practical problems of the importer in the case at bar and the refusal of Congress to be moved from its course by similar considerations, we quote from the prepared statement of the Fine Steel Importers, at page 63 of said hearings:

We have already pointed out that a steel made and imported under the belief that it is a plain carbon steel assessable under paragraph 304 may accidentally contain small quantities of other metals, and let us assume chat a steel so imported, contained exactly one tenth of 1 per cent of vanadium. If this steel were submitted to two different laboratories it is more than likely that one lab-

oratory would report that it contained seven hundredths of one per cent, while the other would report thirteen hundredths of 1 per cent. A similar argument applies in the case of chromium.

If, therefore, paragraphs 304 and 305 are written in their present form, one laboratory would place the steel as assessable under paragraph 304, while the other would place it as assessable under paragraph 305, and the result would be confusion between appraiser, importer, and laboratory, which could only be settled by interminable litigation.

Congress left the vanadium limitation at one-tenth of 1 per cent notwithstanding that appeal.

It is also significant that in the statements of both the American importers of fine steels who wanted a low duty and the Tariff Committee of Tool and Fine Steel Manufacturers, who wanted a high duty, the percentages set forth in paragraph 305 (1) are assumed to be those *which determine, for tariff purposes, whether the steel is an alloy steel.* Thus, in the importers' statement on page 59 of Vol. III, supra, it is said in protesting that paragraph 305 was unjustifiable:

2. It establishes, for the determination of *whether the steel should be considered as an alloy steel* or not, a basis which is illogical, and would make this section of the act unworkable.

Surely it cannot be contended that a steel containing one-tenth of 1 per cent of vanadium or two-tenths of 1 per cent of chromium, or even both, is to be deemed *a genuine alloy steel.* That, for instance [indicating sample], has never been considered as an alloy steel, and still it has close to 0.2 per cent chrome. It is in there. I do not know who is going to determine whether it is 0.2 or whether it is 1.7 or whether it is 2.3 [meaning 0.17 and 0.23?]. [Emphasis ours.]

Similarly, in the statement of the Tariff Committee of the Tool and Fine Steel Manufacturers, Vol. III, supra, at page 54, it is said with respect to the objections of the importers:

The other objection raised to paragraph 305 was in regard to the minimum content of alloy present *which should constitute an alloy steel for tariff purposes.* In the act of 1922 this minimum content was placed at six-tenths of 1 per cent. * * * The low limit of one-tenth of 1 per cent vanadium and two-tenths of 1 per cent chromium, tungsten, molybdenum, etc., are simply to prevent the classing of materials *as alloy steels* when they contain what we may call accidental traces of these metals. [Emphasis ours.]

It seems clear from the foregoing that while the aforesaid domestic manufacturers' committee and the importers disagreed as to whether paragraph 305 should be modified, they were in agreement *that the percentages set forth in that paragraph actually determined, for tariff purposes, what constituted alloy steels.* There is no reason why the importers should have expressed such indignation as to the low percentages unless they felt them to be actually determinative of the rates of duty and Congress seems clearly to have so regarded them in enacting paragraph 305.

## CONCLUSION

As a result of a not too easy investigation which has developed the material set forth above, on the basis thereof, and of what we have seen in the course of it, we reach the conclusion that paragraph 305 must be construed as imposing the additional duty on the steel in the imported tubing and casing because, in contemplation of law, it all contains manganese "in excess of 1 per centum." It is our view that Congress did not intend to leave it open to be decided whether the manganese was used "in alloying" the particular steel imported, in the sense of making what the trade might consider to be an "alloy steel," but rather set its own determinant by providing simply that if manganese is present in excess of 1% the extra duty shall be paid.

Congress was very well informed by surveys, hearings, and summaries as to various points which have been urged upon us here, such as just how manganese is used in steel making as a deoxidizer in making ordinary carbon steel, the recognized difference between carbon steels and alloy steels, and the amount of manganese to be expected in carbon steels. Appellant has urged us to recognize that steels containing significant quantities of manganese are not considered to be alloy steels until the manganese content exceeds 1.65% and that the intent of paragraph 305 was to impose the additional duty only on alloy steels. We have noted, however, that in many ways Congress was informed that carbon steels generally contain less than 1% of manganese and that more than 1% of manganese may definitely affect the properties of the steel, notwithstanding that it got into the steel in the first place as a deoxidizer rather than as an alloying material. We have also noted that Congress and witnesses at hearings representing steel importers were not always in agreement as to what an alloy steel is. In the face of specific requests to raise the 1% to 1½% Congress adhered to the 1% provision. This seems to us to clearly indicate an intent on the part of Congress that manganese present in steel "in excess of 1 per centum" *shall* be considered as alloying material.

While paragraph 305 has frequently been referred to as the "alloy steel" provision and has been discussed under the heading of "alloy steels," it is noted that it does not refer to "alloy steel" but rather to "all steel" which contains certain enumerated alloying metals "or any other metallic element used in alloying steel." Considering the particularity with which Congress specified the percentages of the alloying materials and the changes it made therein, it seems clear to us that Congress did not intend to have the question of liability for additional duty determined by the common or commercial meaning of "alloy steel."

While we think we would be justified in finding on the evidence of record that the imported casing and tubing is not made of "alloy steel" within accepted engineering definitions, they are irrelevant to the decision since Congress has, in effect, provided its own definition. While, as we indicated at the beginning, we find some ambiguity in paragraph 305, we also feel that our construction of it places less of a strain on the language than does a construction that the manganese, though in excess of 1%, must have been incorporated in the heat "as an alloying element."

The judgment of the Customs Court is *reversed*.

WORLEY, C. J., concurs in result.